In the
**UNITED STATES DISTRICT COURT**
for the **SOUTHERN DISTRICT OF INDIANA**,
INDIANAPOLIS DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, *ex rel.* ) | |
| **CURTIS J. LUSBY**, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| *vs.* ) | **CAUSE NO. 1:03-CV-0680-SEB/WTL** |
| ) | |
| **ROLLS-ROYCE CORP.**, ) | |
| ) | |
| Defendants. ) | |

# E N T R Y
## on Defendant's Motion for Judgment on the Pleadings (doc. no. 65)

Relator Curtis J. Lusby, a former employee of Defendant Rolls-Royce Corp., brings this *qui tam* action under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, alleging that Rolls-Royce submitted false claims and made false statements to the United States Government in relation to contracts for the manufacture of engine turbine blades, vanes, and nozzles.  Rolls-Royce now moves under Fed. R. Civ. P. 12(c) for judgment on the pleadings, arguing that Mr. Lusby has failed to make his allegations with the particularity that is required for fraud claims by Fed. R. Civ. P. 9(b).

For the purpose of a motion for judgment on the pleadings, the well-pleaded allegations of the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff.  *Pisciotta v. Old National Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007).

Mr. Lusby first worked as a contract design engineer with Rolls-Royce[1] starting in August 1992. He worked in the "T56/501 department." The T56/501, or "T56", is an aircraft engine which Rolls-Royce has manufactured and supplied to the federal government for military and quasi-military uses since 1948. Four years later, Mr. Lusby was hired as a regular employee in the position of Senior Project Engineer in the Engineering Department.[2] His employment with Rolls-Royce terminated in November 2001.

Rolls-Royce supplies complete engines, engine assemblies, engine subassemblies, and parts to the Government pursuant to contract.[3] It has also performed repair and overhaul services for the Government's installed T56 engines as well and supplied parts for repairs and overhauls performed by others. As concerns this lawsuit, the T56 engine consists of a compressor section, combusters, a turbine section, and a gear case. The turbine section includes four rotor assemblies and each rotor assembly consists of turbine blades, vanes, and nozzles.[4] During his employment, Mr. Lusby gained "personal knowledge of design features, manufacturing methodology, and quality issues associated with the final production and inspection of turbine blades, turbine nozzles, vanes and other parts being sold to the Government," Complaint, ¶ 8,

---

[1] Mr. Lusby actually began working for Rolls-Royce's predecessor, the Allison Gas Turbine Division of General Motors. Subsequently, this Division became an independent company, the Allison Engine Company. Rolls-Royce later became the successor to Allison by merger. In this Entry, "Rolls-Royce" also refers to its predecessors.

[2] The complaint does not so state, but we will assume for the present motion that Mr. Lusby continued to work on the T56 engine in his new position.

[3] The Complaint refers variously to a contract, contracts, and a "prime contract."

[4] Thankfully, it is not important to understand the exact functions of each of these components, or the details of the manufacturing process, for the purpose of determining the present motion.

and he is "knowledgeable about Rolls-Royce's manufacturing, quality control, and quality assurance operations and has direct and independent knowledge of the information" on which his allegations are based, *id.*, ¶ 65.

Mr. Lusby contends that the Government requires its contractors to maintain quality control over their manufacturing processes and to offer to the Government for acceptance only goods that conform to the specifications of its contracts. He contends that engineering, manufacturing, and quality-control requirements and standards are provided in or adopted by the contracts and/or official federal regulations. Mr. Lusby also believes that Rolls-Royce's contract or contracts with the Government contain warranties provided in federal regulations.

According to Mr. Lusby, since prior to the commencement of his employment and continuing to the present day, Rolls-Royce has engaged in improper, faulty, and/or unreliable manufacturing and inspection processes which resulted in the delivery of T56 engines and parts to the Government that did not conform to the specifications of its contracts. Rolls-Royce allegedly was aware of these deficiencies and the non-conformance of the goods, in part because Mr. Lusby had informed higher management, but it nonetheless continued, and still continues, to supply defective T56 engines and parts to the Government.

In 1991, the Government determined that certain Rolls-Royce turbine blades did not conform to contract specifications. Rolls-Royce represented to the Government that it had developed a test to determine blade compliance. Mr. Lusby believes that the only test that Rolls-Royce employed at that time was one of the tests which he had reported to upper management was defective and inadequate to determine compliance. Upon application of the Rolls-Royce

test, 42% of existing blades in the Government's inventory were found to be defective, but application of a proper test would have revealed that the remaining blades were defective as well. On March 11, 1999, in reliance on Rolls-Royce's misrepresentation that it had a reliable conformance test, the Government entered into a settlement agreement with Rolls-Royce for only a fraction of the damage caused by delivery of the defective blades.

The False Claims Act authorizes private persons to bring civil actions for violations of the Act on their own behalf and on behalf of the United States. An action under the Act is pled in the name of the United States. The complaint is filed under seal, served on the Government, and not served on the defendant until the court so orders after the Government has had an opportunity to decide whether to intervene and proceed with the action. 31 U.S.C. § 3730(b).

On May 5, 2003, Mr. Lusby filed his initial complaint in this Cause. On July 29, 2005, the Government formally declined to intervene and, on August 2, 2005, the Court lifted the seal and ordered Mr. Lusby to file his complaint on Defendant Rolls-Royce. Sixteen months later, on December 7, 2006, after his initial and substitute counsel both withdrew, Mr. Lusby filed a *pro se* amended complaint which repeated verbatim the allegations of the first complaint, but substituted his own signature for withdrawn-counsel's signature, and, for the first time, he then served the complaint on Rolls-Royce. While Rolls-Royce was obtaining extensions of time to answer, Mr. Lusby obtained new counsel and was granted leave to file the current "First Substantive Amended Complaint" ("Complaint") on February 9, 2007, which contained new allegations and claims. Rolls-Royce answered the Complaint on March 26, 2007, and filed the present motion for judgment on the pleadings on May 22, 2007. Discovery has been stayed

pending our ruling on this motion.

The Complaint asserts two counts of violations of the False Claims Act. Count 1 asserts violations of 31 U.S.C. § 3729(a). This subsection contains seven paragraphs of statutory violations:

> **(a) Liability for certain acts.** — Any person who —
>
> **(1)** knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>
> **(2)** knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
>
> **(3)** conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;
>
> **(4)** has possession, custody, or control of property or money used, or to be used, by the Government and, intending to defraud the Government or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt;
>
> **(5)** authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;
>
> **(6)** knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge the property; or
>
> **(7)** knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,
>
> is liable to the United States Government . . . .

31 U.S.C. § 3729(a). Mr. Lusby does not specify which paragraph or paragraphs of subsection (a) he contends were violated. Under Count 1, the Complaint alleges that Rolls-Royce **(1)** "knowingly and falsely represented to the Government or its agents and suppliers that its parts

and operations were in full compliance with the terms of the operative Government contracts and the subcontract agreements in order to obtain payments pursuant to the contract . . .", Complaint, ¶ 67; **(2)** "knowingly presented or caused to be presented to an officer or employee of the United States Government false and fraudulent claims for payment or approval," *id.*, ¶ 68; and **(3)** "knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved pursuant to contracts with the United States Government," *id.*, ¶ 69.

Count 2 specifically references a violation of § 3729(a)(7), alleging that Rolls-Royce knowingly made false statements that it had an adequate method to test the compliance of its turbine blades with contract specifications in order to induce the Government to enter into the 1999 settlement agreement for a fraction of the damage caused by blades' defects, and thus to conceal, avoid, or decrease Rolls-Royce's obligation to pay or transmit money or property to the Government.

To prevail on his False Claims Act claims, Mr. Lusby must prove three elements: (1) Rolls-Royce presented a claim or made a statement to the Government in order to receive money; (2) the claim or statement was false or fraudulent; and (3) Rolls-Royce knew that it was false or fraudulent. *See United States ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005). Because a claim under the Act alleges fraud,[5] Fed. R. Civ. P. 9(b) applies, requiring that a relator plead more than the "short and plain statement of the claim"

---

[5] Rule 9(b) applies "because the False Claims Act condemns fraud but not negligent errors or omissions." *Garst*, 328 F.3d at 376.

allowed by Fed. R. Civ. P. 8(a): "the circumstances constituting fraud . . . shall be stated with particularity." *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir.), *cert. denied*, 540 U.S. 968, 124 S.Ct. 450, 157 L.Ed.2d 313 (2003). Heightened pleading requirements for fraud claims not only give defendants a clearer understanding of the allegations they must answer but provide enhanced protection against the consequences of false or mistaken allegations:

> The purpose of requiring that fraud be pleaded with particularity is not, as it might seem and the cases still sometimes say, to give the defendant in such a case enough information to prepare his defense. A charge of fraud is no more opaque than any other charge. The defendant can get all the information he needs to meet it by filing a contention interrogatory. The purpose (the defensible purpose, anyway) of the heightened pleading requirement in fraud cases is to force the plaintiff to do more than the usual investigation before filing his complaint.
>
> Greater precomplaint investigation is warranted in fraud cases because public charges of fraud can do great harm to the reputation of a business firm or other enterprise (or individual), because fraud is frequently charged irresponsibly by people who have suffered a loss and want to find someone to blame for it and because charges of fraud . . . frequently ask courts in effect to rewrite the parties' contract or otherwise disrupt established relationships. By requiring the plaintiff to allege the who, what, where, and when of the alleged fraud, the rule requires the plaintiff to conduct a precomplaint investigation in sufficient depth to assure that the charge of fraud is responsible and supported, rather than defamatory and extortionate.

*Ackerman v. Northwestern Mutual Life Ins. Co.*, 172 F.3d 467, 469-70 (7th Cir.) (citations omitted), *cert. denied*, 528 U.S. 874, 120 S.Ct. 178, 145 L.Ed.2d 151 (1999). *United States ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301, 1310 (11th Cir. 2002) ("'The particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior'"), *cert. denied*, 537 U.S. 1105, 123 S.Ct. 870, 154

L.Ed.2d 774 (2003).

> Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Id.*, 290 F.3d at 1310.

The level of particularity required for a False Claims Act is well-established. In short, "[f]alse claim allegations must relate to actual money that was or might have been doled out by the government based upon actual and particularly-identified false representations." *Gross*, 415 F.3d at 605. The who, what, where, and when of a False Claims Act allegation must specifically identify an actual false claim or statement and specify how or why Government payment of money was conditioned thereon. *Id.* A relator must plead facts as to the time, place, and substance of a defendant's alleged fraud, and who engaged in them. *Clausen*, 290 F.3d at 1308 ("'This requirement makes it hard for many persons to bring a *qui tam* suit and guards against "guilt by association."'"). Specific dates, amounts, and contents of false claims or statements must be provided, as well as specific facts showing that a specific payment of money by the Government was conditioned on those claims or statements. *Clausen*, 290 F.3d at 1305; *Gross*, 415 F.3d at 605; *Garst*, 328 F.3d at 378. Actual claims must be specifically identified because it is the claim for payment that is actionable under the Act, not the underlying fraudulent or improper conduct. *Clausen*, 290 F.3d at 1311 ("Without the *presentment* of such a claim, while the practices of an entity that provides services to the Government may be unwise or improper, there is simply no actionable damage to the public fisc as required under the False Claims Act.

The submission of a claim is thus not . . . a 'ministerial act,' but the *sine qua non* of a False Claims Act violation."). "[A]s with every other facet of a necessary False Claims Act allegation, if Rule 9(b) is to be adhered to, some indicia of reliability must be given in the complaint to support the allegation of *an actual false claim* for payment being made to the Government." *Id.*

The Complaint in this case falls far short of the particularity required by Rule 9(b) of False Claims Act actions. The Complaint is profuse with particular details about the components and functions of the T56 engines, Rolls-Royce's manufacturing process, the types of quality-assurance inspections and tests it employed, and the alleged inadequacies of those manufacturing and inspection processes. What the Complaint utterly fails to provide, however, are the particulars of *any* actual claim submitted or statement made by Rolls-Royce to the Government for the purpose of obtaining payment. There is no identification of dates, amounts, authors, or contents of, or payments as a result of, any claims or statements. Neither is an actual Government contract with Rolls-Royce identified by date or content and no actual delivery of, or payment for, goods is alleged. As the *sine qua non* of a False Claims Act claim, the failure to identify the submission of a single claim is fatal.

Mr. Lusby argues that his allegations are sufficient because he has identified specific regulatory provisions that require Government contractors to deliver only goods that have been inspected, conform to contract specifications, and are warranted; he alleges that Rolls-Royce has delivered goods to the Government pursuant to contracts; and he alleges that Rolls-Royce's manufacturing and inspection processes are faulty, resulting in its knowing delivery of faulty goods. He thus relies on a chain of logic to establish what should have, must have, or likely

9

resulted in false claims or statements. But, as the authorities cited above hold, such assumptions are insufficient for stating a fraud claim:

> As such, Rule 9(b)'s directive that "the circumstances constituting fraud or mistake shall be stated with particularity" does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government. . . . as with every other facet of a necessary False Claims Act allegation, if Rule 9(b) is to be adhered to, some indicia of reliability must be given in the complaint to support the allegation of *an actual false claim* for payment being made to the Government.

*Clausen*, 290 F.3d at 1311 (original emphasis). The False Claims Act does not create liability for cost overruns, contractors' improper internal procedures, breaches of contracts, or for disregard of regulations; liability is imposed only for the knowing submission of false claims or statements for the purpose of obtaining payments from the Government. *Gross*, 415 F.3d at 605 (such conclusory allegations "shed no light on the nature or content of the individual forms or why any particular false statement would have caused the government to keep the funding spigot open, much less when any payments occurred or how much money was involved. This does not satisfy 'the who, what, when, where, and how' requirement for pleading fraud under Rule 9(b)"); *Garst*, 328 F.3d at 378; *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005), *cert. denied*, 127 S.Ct. 42, 166 L.Ed.2d 18 (2006). Mr. Lusby's Complaint raises questions only about the efficacy of Rolls-Royce's internal manufacturing and inspection processes, matters to which the False Claims Act does not apply.

The Complaint's lack of particulars about specific contracts between Rolls-Royce and the Government, specific false claims submitted or statements made by Rolls-Royce to the Government, and specific deliveries by Rolls-Royce of known faulty goods to the Government is

not unexpected based on a reading of the Complaint because there is no allegation that Mr. Lusby has any reliable basis for personal knowledge of Rolls-Royce's contracting, claiming, or delivery operations. The Complaint states only that Mr. Lusby has personal knowledge of "design features, manufacturing methodology and quality issues associated with the final production and inspection of turbine blades, turbine nozzles, vanes and other parts", Complaint, ¶ 8, and that he "is knowledgeable about Rolls-Royce's manufacturing, quality control, and quality assurance operations", *id.*, ¶ 64. There is also a general catch-all assertion that he "has direct and independent knowledge of the information on which these allegations are based", *id.*, ¶ 64, but there is no indication of any basis for his claimed knowledge of any information beyond manufacturing and quality matters to give that indicia of reliability required for False Claims Act actions. Many of his crucial allegations, in fact, are based on "information and belief", *id.*, ¶¶ 41, 53, 77, 80, 81, and provisions that Rolls-Royce's contracts are "believed to contain", *id.*, ¶¶ 25, 26, 27, or "should contain," ¶ 28; but allegations based on "information and belief" are insufficient under Rule 9(b), *see*, *e.g.*, *Corsello*, 428 F.3d at 1013-14, and *Clausen*, 290 F.3d at 1310.[6]

Even the production and inspection matters about which the Complaint attempts to be specific are insufficiently particular to support his logical chain. Mr. Lusby alleges that Rolls-Royce's deficient manufacturing processes and quality-assurance tests resulted in the production and delivery of parts that failed to meet contract specifications, yet the Complaint fails to

---

[6] Particular allegations about deliveries, claims, and payments are essential to protect defendants who, for example, might have declined to deliver or bill for defective goods, *see Garst*, 328 F.3d at 378, or who informed the Government about nonconformities in goods.

11

identify any actual contract specifications applicable to blades, vanes, or nozzles; the number or production-run proportion of parts that failed to meet those specifications; or the number or proportion of faulty parts that were actually delivered to the Government.  For example, the Complaint describes "allowed tolerances or margins of error", Complaint, ¶ 34, without specification of the tolerances or their sources; products that were "typically more than ten(10) times outside of allowable tolerances", *id.*, without providing any definition of "typically"; production processes that were "compromised" and parts that were consequently "improperly machined," ¶ 36, without identifying the number of faulty goods made or delivered, or relating the improprieties to contract specifications; a tolerance that was "generally required to be .0005 inches or less," ¶ 40, without defining "generally" or identifying the source of the tolerance; random audits that found "the majority of blades inspected were at the limit of or exceeded tolerances allowed by the blueprint and manufacturing specifications," ¶ 41, without specifying the tolerances or identifying the contract sources, the dates of inspection, the number or proportion of blades that met or exceeded[7] tolerances, or the number or proportion of faulty blades that were actually delivered to the Government; Rolls-Royce's Materials Review Board "regularly allow[ing] the delivery sale of nonconforming Parts" "[d]espite undisputed presence of features outside the specifications for the Parts", ¶ 44, without indicating when such deliveries took place, how many defective parts were delivered, what specifications were not met, or how Mr. Lusby has personal knowledge of parts deliveries; and "Rolls-Royce made no disclosures or inadequate disclosures of the nonconforming Goods and Parts to the Government," ¶ 53, without

---

[7] The description that inspected blades were "at the limit of" tolerances suggests that, while perhaps not perfect, they nonetheless passed inspection.

indicating how Mr. Lusby is aware of Rolls-Royce's disclosures to the Government, the content of those disclosures ("no" disclosures is significantly different from "inadequate" disclosures), or which goods or parts are at issue.

Count 2 suffers from the same deficiencies. It alleges that Rolls-Royce knowingly made false statements to the Government about the efficacy of a quality-assurance test in order to induce the Government to settle a dispute about defective turbine blades in exchange for a lower payment by Rolls-Royce and, thus, to conceal, avoid, and/or decrease its obligation to the Government in violation of 31 U.S.C. § 3729(a)(7). However, *inter alia*, the Complaint fails to identify particularly (by date, content, or maker) any actual statement by Rolls-Royce to the Government, fails to identify the contract or contracts and payments at issue, and fails to allege particular facts showing that the statement induced the Government's settlement. Rule 9(b) requires that such specifics be included in the Complaint.

Mr. Lusby argues that the heightened-pleading standard should be relaxed in this case because the missing particulars are in the possession of Rolls-Royce, but neither Rule 9(b) nor the False Claims Act authorizes such leniency, especially in the absence of reliable allegations indicating that particulars of fraudulent claims exist. *See Clausen*, 290 F.3d at 1314 n. 25; *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992). Mr. Lusby is not entitled to receive a "ticket to the discovery process," *Clausen*, 290 F.3d at 1307, in order to meet Rule 9(b)'s particularity requirement or to discover whether a False Claims Act claim against Rolls-Royce in fact exists.

Because Mr. Lusby has failed to plead his False Claims Act claims against Rolls-Royce

13

with the particularity required by Fed. R. Civ. P. 9(b), Rolls-Royce's motion for judgment on the pleadings is **GRANTED** and the operative First Substantive Amended Complaint (Doc. no. 51) is **DISMISSED**. Mr. Lusby shall have until **Friday, January 25, 2008** either to file and serve a motion for leave to file an amended complaint, with proposed complaint attached, that satisfies the particularity requirement of Rule 9(b) or to dismiss this action. The stay of discovery remains in effect.

Date: 12/20/2007

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Koryn Michelle Markham
BARNES & THORNBURG, LLP
koryn.markham@btlaw.com

Edward A. McConwell, Sr.
McCONWELL LAW OFFICES
ed@mcconwell.com

Peter Abernethy Morse, Jr.
BARNES & THORNBURG, LLP
pmorse@btlaw.com

Joseph Striewe
joestriewe@striewelaw.com

Richard P. Winegardner
BARNES & THORNBURG, LLP
rwinegar@btlaw.com

Jill E. Zengler, Assistant United States Attorney
UNITED STATES ATTORNEY'S OFFICE
jill.zengler@usdoj.gov