UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

UNITED STATES OF AMERICA, *ex rel.*       )
CURTIS LUSBY,                             )
                                          )
                    Plaintiff,            )
                                          )
          vs.                             )          1:03-cv-680-SEB-WGH
                                          )
ROLLS-ROYCE CORPORATION,                  )
                                          )
                    Defendant.            )

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is now before the Court on Defendant's Motion for Summary Judgment
[Docket No. 275], filed on October 7, 2011, pursuant to Federal Rule of Civil Procedure
56.  Relator Curtis J. Lusby, a former employee of Defendant Rolls-Royce Corporation
("Rolls-Royce"), brings on behalf of the United States this *qui tam* action under the False
Claims Act, 31 U.S.C. § 3729 *et seq.*, alleging that Rolls-Royce submitted false claims to
the United States Government in relation to contracts for the manufacture of engine
turbine blades and vanes (also called "nozzles").  Specifically, Relator contends that,
although Defendant had knowledge that its manufacturing and inspection processes were
incapable of producing engine parts that conformed to contractual specifications and
requirements with any regularity, Defendant continued to sell those parts to the
Government, falsely certifying that the parts were conforming and that Defendant was in
full compliance with its obligations under its quality assurance system.  For the reasons

detailed in this entry, we <u>GRANT</u> Defendant's Motion for Summary Judgment.

**Factual Background**

**General Background**

This case relates to Rolls-Royce's manufacture and sale to the United States Government of spare parts for the T56/501, or "T56", aircraft engine.[1]  The T56 is a turboprop engine that was developed in the 1950s, and is one of the longest serving engines in the U.S. Government's fleet.  Declaration of Robert Cedoz ("Cedoz Decl.") ¶ 7; Deposition of Richard Whitehurst (Whitehust Dep.") at 154:17-155:3.  Series I T56 engines were first used in 1956; Series II engines in 1958; Series III in 1964; and Series IV engines in 1986.  Sec. Am. Compl. ¶ 14.  A turboprop engine generates power in a manner similar to a jet engine, except that a T56 engine turns a propeller as opposed to creating jet thrust.  Air enters the engine through an opening behind the propeller, and a compressor forces the air into a combustion chamber under pressure.  Once fuel is injected, the fuel-air mixture is ignited and enters the T56's turbine section (see Figure 1 below), which generates the engine's power.  Cedoz Decl. ¶¶ 7, 9.

---

[1] Mr. Lusby's Amended Complaint references one part that is contained in a "501k" engine, an industrial engine that is based on the T56 model and used to create electrical power.  Because the differences between the 501k and T56 engines are not relevant to the resolution of the instant motion, we use the term "T56 engine" in this ruling to include both types of engine.

Figure 1:



The claims at issue in this litigation concern certain parts from the turbine section of the T56 engine, specifically the turbine "vanes" (also called "nozzles") and "blades." T56 turbine vanes and blades are arranged in four couplets, or "stages," with the vane in front and blades behind.  Vanes are stationary, and direct the hot gasses from the combustion chamber so that they hit the blades, which are attached to wheels.  The hot gas flow causes the blades and wheels to rotate to turn a shaft, which turns a gearbox, which ultimately turns a propeller.  Id. at ¶¶ 9, 11, 17.  All blades in the turbine wheels have what is referred to as a "fir tree" base (see Figure 2 below) that is inserted into slots cut into the turbine wheel by a broach.  This attachment is designed to withstand high mechanical loading in order to ensure the blades remain bound in a rotary motion.  Sec. Am. Compl. ¶ 38.

Figure 2:



Rolls-Royce does not manufacture the T56 engine parts at issue in this litigation in the sense of making them from scratch. The first stage through third stage blades are made by precision casting (pouring molten metal into a form) and then machined to specified finished features that cannot be cast to size. The fourth stage blade is forged (precision hammered) to shape. Id. ¶ 39. The parts are actually cast and forged, not by Rolls-Royce, but by an independent company. Those parts then come to Rolls-Royce, whose manufacturing processes generally consist of machining limited sections of the blades, vanes, and wheels in order to ensure a proper fit in the T56 engine.

**The Government Contracts at Issue**

During the time period applicable to this litigation, to wit, May 9, 1997 through December 31, 2001, Rolls-Royce sold T56 turbine blades and vanes to the U.S. Government pursuant to various written contracts. For example, the United States Air Force entered into a number of Basic Ordering Agreements ("BOAS") with Rolls-Royce, including: F34601-92-G-0028, F34601-95-G-0012, F34601-98-G-0011, and F34601-01-

D-0155.[2]  Rolls-Royce also entered into contracts with the United States Navy to supply

T56 engine parts, including: N00383-91-D-0004, N00383-95-D-051M, N00383-95-

052M, and N00383-00-D-0003M.  Sec. Am. Compl. ¶¶ 16-17.  Each BOA agreement and

accompanying delivery orders define the parameters of Rolls-Royce's contractual

obligations.  Declaration of David Becker ("Becker Decl.") ¶ 7.  Rolls-Royce delivered

hundreds of thousands of T56 engine parts pursuant to the above contracts during the

period relevant to this litigation.

Not every BOA and/or delivery order contains the same contractual requirements.

For example, the F34601-98-G-0011 contract provides that a "Certificate of

Conformance" under Federal Acquisition Regulation ("FAR") 52.246-15,[3] to wit, a

certificate providing that the parts sold in that shipment conform to particular

specifications, is necessary if subsequently required by the Government (e.g., in a

delivery order).  Docket No. 141-1 at 3.  In contrast, contract F34601-01-D-0155 does not

reference certificates of conformance or otherwise incorporate FAR 52.246-15.  Docket

No. 141-2.

Although it is apparently undisputed that Rolls-Royce did not supply a certificate

of conformance with every part that it sold under the applicable contracts, many of the

shipments that the company made pursuant to these contracts were accompanied by one

---

[2] These contracts reference and/or incorporate certain Federal Acquisition Regulations
("FARs"), including FAR 52.246-1, 52.246-2, 52.246-11, and 52.246-15.

[3] FAR 52.246-15 provides in relevant part that certificates of conformance shall be used
"[w]hen authorized in writing" by the Contract Administration Office.  FAR 52.246-15(a).

of two different certifications.   The first type of certificate provides in relevant part as

follows:

> The supplies comprising this shipment have been subjected to and have
> passed all examinations and tests required by the contract, were shipped in
> accordance with authorized shipping instructions, and conform to the
> quality, identity, and condition called for in contractual requirements and to
> the quantity shown on this document.

RR Exh. 8A.  The second certificate that was used by Rolls-Royce states:

> This certifies that the product models, assemblies, and/or parts listed have
> been manufactured, identified, and controlled in accordance with our ISO
> 9001 Quality System and the applicable drawing and specifications and/or
> customer agreed to requirements.  This certification is not a warranty and
> shall not be construed as changing or modifying the force or effect of any
> warranty provided by Rolls-Royce on the subject product models,
> assemblies, and/or parts.

Def.'s Mem. at 27.

**Relator's Employment Relationship with Defendant**

Mr. Lusby first worked for Rolls-Royce in August 1992 as a contract design

engineer in the T56/501 department.  Four years later, Mr. Lusby was hired as a regular

employee in the position of Senior Project Engineer in the Engineering Department.  His

employment with Rolls-Royce terminated in November 2001.  Mr. Lusby contends that

his work as a design engineer required him to be familiar with all stages of the

manufacturing processes relating to the T56 blades and vanes.  Lusby Decl. ¶ 8.  Rolls-

Royce, however, maintains that for most of the time period relevant to this litigation, Mr.

Lusby was assigned to a repair group that was located at a Rolls-Royce facility that had

little involvement with the T56 engine.  To the extent that Mr. Lusby worked on spare

6

parts for the T56 engine while he was employed by Rolls-Royce, his work was primarily directed to vanes for one series of T56 engine and he testified by deposition that his work on turbine blades was only "a hobby." Lusby Dep. at 126:26.

**Defendant's Manufacture of the Parts at Issue in this Litigation**

In deciding the manner in which to manufacture the T56 engine parts, Rolls-Royce follows design requirements contained in Government-approved blueprint specifications ("drawings") and Advanced Engineering Memoranda ("AEMs") as well as in written specifications identified in the drawings and AEMs, such as Engineering Department Instructions ("EDIs"). Declaration of David Reinhart ("Reinhart Decl.") ¶ 4; Cedoz Decl. ¶¶ 20-27. The contracts at issue in this litigation require each part that is sold to conform to these specifications. The Government generally must sign off on changes in Rolls-Royce's manufacturing and inspection processes that would affect these design requirements. Whitehurst Dep. at 156-57.

Rolls-Royce has translated the Government's design requirements into manufacturing and inspection routings, which are step-by-step processes used to make the parts. In addition to incorporating the Government-approved design requirements, these routings also account for manufacturing realities, such as space, equipment, and personnel. Over the years, as the Government proposed or accepted changes in its design requirements, the routings also changed. Reinhart Decl. ¶ 6; Cedoz Decl. ¶ 15. There is no indication in the record that the Government was required to approve Rolls-Royce's routings.

Mr. Lusby's claims concern spare parts for three different versions of the T56 engine, to wit, the T56 Series II (which was first introduced in 1958); the T56 Series III (introduced in 1964); and the T56 Series IV (introduced in 1986). The parts for each series of the T56 engine have different design specifications and, in some cases, are not manufactured and inspected in the same manner. There are also multiple versions of some parts within the same series, all with different specifications. Because the blades and vanes are not serialized, in order to determine the specifications of a particular part or the manner in which it was manufactured and inspected, the series, stage, part number, and date of manufacture must be known. Cedoz Decl. ¶¶ 11-12.

The majority of Relator's allegations in this lawsuit involve manufacturing and inspection processes applicable to Series II and Series III blades. The machining completed by Rolls-Royce on these parts generally involves work on each blade's "fir tree." Id. ¶ 17. As noted above, a blade's fir tree fits into the turbine wheel and secures the blade in the wheel. What is referred to as a "stalk," extends from the fir tree to a base. Id. The airfoil of the blade is the longest part of the blade and is located above the stalk. The fir tree design varies from blade to blade. Id.

At various points during the relevant time period, Rolls-Royce employed the following four manufacturing and inspection processes for the T56 Series II and III blades and vanes,[4] which Mr. Lusby contends failed to produce conforming parts on a

---

[4] The parties do not devote a significant portion of their briefs to discussion of the
(continued...)

8

reliable basis: (1) the "best fit" manufacturing method; (2) the "P-Point" manufacturing method; (3) "tip shake" inspections; and (4) inspections of machined features of the blades based on datums on the matrix pour up box used with the best-fit and P-Point manufacturing methods.  According to Rolls-Royce, whether and when these processes were utilized was dictated by the Government-approved design specifications for particular parts and the company merely applied them when it was required by the applicable specifications.

The "best fit" and "P-Point" manufacturing processes are both matrix-based systems that were used to position the raw casting airfoil of a blade or vane in order to hold the part during subsequent machining operations.  The best fit process was the historical method for manufacturing T56 blades and uses "a powerful magnifying glass and detailed charts ... to 'best fit' a blade within a matrix block.  A matrix is then poured around the blade and it solidifies, holding the blade."  Reinhart Decl. ¶ 8.  By May 9, 1997, Rolls-Royce no longer used the best fit method for manufacturing the majority of the blades at issue in this litigation and had instead switched to using the P-Point process. Id. ¶ 11.

The P-Point method is another matrix encapsulation method which utilizes "a nesting feature that holds the blade in the proper position as matrix is applied to hold the

---

[4](...continued)
manufacturing and inspection processes applicable to Series IV blades and vanes.  However, Mr. Lusby contends that a "pour up" system similar to that used to manufacture Series II and III parts was used to manufacture the Series IV parts and that the same inspections were performed.

blade." Id. ¶ 9.  In other words, the P-Point method required Rolls-Royce to insert a

blade into a mold formed with precision-made blocks that held the blade in place.  A low

temperature metal was then poured into the mold.  After solidifying, the blade casting was

held by nearly the entire airfoil so that subsequent machine operations could be

performed.  When using the P-Point method, it was essential that the blade be securely

held while machining operations, such as grinding,[5] were performed.  Sec. Am. Compl. ¶

41.  Rolls-Royce was aware that these processes could permit parts to shift during

machining, if, for example, the matrix material holding the parts in place became too hot

and began to soften or if the matrix was too porous.  Some of these issues were

documented to the Government in 1995 and 1998 reports written by Rolls-Royce

employees.  See RR Exh. 36; RR Exh. 37.  However, the parties dispute whether the

Government was fully informed of and understood these issues.

    "Tip-shake" inspection is a method of inspecting the machine features of certain

parts or components.  In performing the tip-shake inspection, blades are loaded into a

gauge and the displacement of the tip is measured.  In the early 1990s, when Rolls-Royce

performed these inspections, its manufacturing practices allowed the fir tree form to be

hand polished until the blade met the required tip shake reading.  Rolls-Royce later

replaced tip-shake inspections with a different inspection method, called the "over pin

---

[5] Grinding is a process during which grinding wheels create significant loads on a blade's precision features such as the attachment fir tree shape.

and stagger" inspection.[6]  Relator claims that the hand polishing method was not repeatable within acceptable tolerances, and thus, that tip-shake inspections were inadequate to assure blueprint and design specification requirements.  Sec. Am. Compl. ¶¶ 45-46, 56.

The best fit and P-Point manufacturing methods also included inspections of the blades based on datums on the matrix pour up box.  Mr. Lusby alleges that this was the only inspection performed for certain blades, but Rolls-Royce contends that it also used over pin and stagger gauges to ensure that features on the blade were properly machined.

**Defendant's Quality Management System**

Rolls-Royce's manufacture of T56 parts is subject to its Quality Management System ("QMS"), which, for the period relevant to this lawsuit, was approved by the Government and certified to the Organization for Standardization's ISO 9001 Quality Standard.[7]  Before Rolls-Royce was awarded its ISO 9001 certification, an independent auditor conducted a comprehensive review of Rolls-Royce's written quality procedures and its performance under those procedures and verified that they were ISO 9001 compliant.  Becker Decl. ¶¶ 13, 15, 17-18.  In order to maintain ISO 9001 certification,

---

[6] The over pin check "is conducted by using two precision-ground pins of a certain size laid into the load faces on each side of the fir tree" to ensure that the form from side to side is the correct size.  Sec. Am. Compl. ¶ 46.  The stagger check "uses pins with a blade stacking axis and base center plane restrained to check the amount of radial fir tree side to side location relationship."  Id.

[7] Contract F34601-01-D-0155 requires that the contractor maintain a quality system that meets the ISO 9001 standard.

independent auditors conducted surveillance audits every six months throughout the

relevant time period as well as comprehensive recertification audits every three years.  Id.

¶ 20.  Government representatives were present at and observed the audits during which

Rolls-Royce's ISO 9001 compliance was assessed.  Id. ¶¶ 18, 22.

Rolls-Royce's QMS includes various inspections, training, audits, and statistical

sampling used to determine whether the parts being manufactured met the applicable

design specifications and contractual requirements.  The inspections include "in line"

reviews by operators, "overchecks" by inspectors, and "final inspections" at the

completion of the process.  Id. ¶ 33.  These reviews include inspections of the parts

utilizing a "comparator" which is a device that magnifies the part by 25 to 50 times so

that it can be compared to a schematic in order to confirm whether the airfoil was

properly aligned with the stalk and fir tree and fixed appropriately for machining.

Reinhart Decl. ¶¶ 27-28; Cedoz Decl. ¶ 39.  Rolls-Royce's QMS requires sampling

inspections to be performed, in which a certain number of parts in each inspection lot is

sampled for quality purposes.  Becker Decl. ¶ 34.  The QMS also provides for gauges,

tooling, and inspections to verify conformance to the Government's design requirements.

Id. ¶ 35.

Any parts that failed these inspections were either disposed of or referred to Rolls-

Royce's Material Review Board ("MRB") for further analysis, which will be discussed in

further detail below.  In such situations, the company would also take corrective and

preventative action in an attempt to reduce the likelihood that the same problem would

reoccur.  Becker Decl. ¶¶ 46-47.  Although parts that were deemed nonconforming as a result of the inspections performed by Rolls-Royce were supposed to be either disposed of or referred to the MRB, Dale Gordon, who was employed by Rolls-Royce in various capacities throughout the time period relevant to this litigation, testified by declaration that, because of a variety of shortfalls related to the inspection process, including, inadequate gauge repeatability, reliability, and maintenance, inadequate training to enable employees to correctly perform the inspections, and the use of inspection equipment unable to verify conformance to design requirements, he was "aware" of the "potential" for nonconforming parts to be deemed conforming under Rolls-Royce's QAS. Declaration of Dale Gordon ("Gordon Decl.") ¶ 6.  Mr. Gordon does not identify any specific instance in which that occurred, however.

**The Defense Contract Management Agency**

The Defense Contract Management Agency ("DCMA"),[8] an agency of the Government, was involved in overseeing Rolls-Royce's manufacturing processes.  The parties dispute the extent of the DCMA's oversight responsibilities, however.  Mr. Lusby claims that the DCMA officials on site at Rolls-Royce lacked sufficient knowledge and understanding of the T56 engine blade and vane manufacturing and inspection processes necessary for any meaningful oversight.  Rolls-Royce, on the other hand, contends that its manufacturing processes were primarily overseen by the DCMA, who employed contract

---

[8] The predecessor of the DCMA, also an agency of the Government, was known as the "DCMO."  Declaration of Sandra Gosser ("Gosser Decl.") ¶ 13 n.1.

specialists, quality assurance specialists, and aerospace engineers, as well as other professionals to monitor and review Rolls-Royce's quality systems.  Becker Decl. ¶¶ 36-40.  Quality assurance specialists employed by DCMA reviewed the company's manufacturing and inspection routings, comparing those procedures to the Government's design requirements to check for compliance.  Deposition of George Snider ("Snider Dep.") at 13, 15-17.  In addition to participating in the ISO 9001 audits described above, DCMA representatives also conducted their own periodic audits and reviews of the QMS.  Becker Decl. ¶¶ 14, 37-40; Gosser Decl. ¶¶ 16, 18.

Approximately six DCMA employees were located on-site in Rolls-Royce's facilities.  Becker Decl. ¶ 37.  The DCMA representatives had access to all locations where activities relating to the manufacture, inspection, and design of T56 parts were conducted and were free to review any document relating to T56 engine parts.  Gosser Decl. ¶¶ 16, 37-40.  DCMA officials who worked with Rolls-Royce during the relevant time period testified by deposition that they regularly walked the plant floor and observed parts for the T56 engine being manufactured and inspected, checked gauges to ensure that they were the proper type and had been accurately calibrated, reviewed Rolls-Royce's use of the comparator described above to confirm that the alignment of the parts was within the necessary tolerances, and checked finished parts to confirm that the parts met the Government's requirements and were in compliance with the QAS.  Snider Dep. at 13-22; see also Deposition of Phillip Woodward ("Woodward Dep.") at 8, 115-16.

Despite this involvement, the deposition testimony of the DCMA officials in the

record before us evidences varying levels of knowledge and understanding of the structure of the T56 blades and vanes at issue and the manufacturing and inspection processes employed by Rolls-Royce to produce those parts.  For example, certain DCMA representatives testified by deposition that they were not familiar with the steps involved with the best fit and P-Point manufacturing methods or the tip shake inspection. Deposition of Mohanarjo Devaryju ("Devaryju Dep.") at 45, 118-19, 121-22; Woodward Dep. at 90, 100-01.  Another official testified that, although he performed inspections of the gages, he was not "the expert[] with the gages" and that, because the DCMA representatives had so many responsibilities, they could not be an expert in all tasks. Woodward Dep. at 12-13.

The DCMA was also involved in the process of adopting certain changes to the Government's design requirements.  Typically, modifications to the design requirements are made via an AEM, which is then presented to and approved by the Government before it takes effect.  There are two classifications of AEMs: Class I and Class II.  A Class I change is a change affecting the form, fit, or function of a part[9] and requires approval at the major military command headquarters for the program.  A Class II change is one that does not affect form, fit, or function and may be approved by local Government representatives, usually from the DCMA.  Cedoz Decl. ¶¶ 22-25.  Before signing off on a change, DCMA engineers review the AEM to confirm that the change is

---

[9] Changes that affect form, fit, or function are those that have an impact on the part's "[i]nterchangeability, reliability, maintainability, sustainability."  Devaryju Dep. at 55-56.

properly classified and will not in fact affect the form, fit or function of the part.  That is

the extent of their involvement in the approval process.  Devaryju Dep. at 17-18.  DCMA

engineers who review the AEMs are permitted to ask whatever questions and receive

whatever additional documentation they feel is necessary before determining whether the

proposed change is a Class I or Class II change.  Id. at 16-18, 53.   After changes to an

AEM are approved, Rolls-Royce alters its manufacturing and inspection routings as

necessary in order to comply with the revised design requirements.

**The Materials Review Board**

The Government requires Rolls-Royce to utilize a Materials Review Board

("MRB") as part of its QMS.  When the QMS identifies parts that appear not to conform

to Government requirements or otherwise fail to meet the inspection criteria, they are

processed by the MRB.  Parts enter the MRB process only after they have been found to

have a possible nonconformance.  At that point, the MRB performs an engineering

evaluation to determine whether a nonconformance does in fact exist and, if so, whether

the nonconformance affects the form, fit, or function of the part.  The MRB records its

engineering analysis in a Technical Analysis Report ("TAR"), which describes the cause

and effect of the nonconformance.  If the review process determines that the part,

although nonconforming, nevertheless can be accepted as meeting the form, fit, and

function requirements of the Government's design specifications or can be salvage-

repaired to meet those requirements, it can be offered to the Government for purchase

under a "concession."  Gosser Decl. ¶¶ 9-10.

After Rolls-Royce completes its analysis, the TARs are reviewed by the DCMA which decides whether to assent to a concession.  If the Government assents to a concession, it agrees to purchase the part, despite the nonconformance.  According to Rolls-Royce, in such cases, the part is defined as "conforming" under the QMS.  Id. ¶ 9. In determining whether to accept parts through the MRB process, the DCMA can request further documentation from Rolls-Royce if the department needs more information regarding the analysis in the TAR before deciding whether to accept the part under a concession.  There is no indication that Rolls-Royce failed to provide such information when requested.  Devaryju Dep. at 21-22.

Until September 1998, a Government representative reviewed every TAR prior to accepting any part that had been through the MRB process.  In September 1998, the DCMA determined that the Government no longer needed to review every TAR and instead conducted periodic audits of Rolls-Royce's MRB process to ensure that it was functioning properly.  However, on August 14, 2001, as a result of a change in contractual requirements, the DCMA once again began reviewing every TAR.  Gosser Decl. ¶¶ 26-27.

In cases in which a particular part was repeatedly referred to MRB because of a nonconformance that did not affect that part's form, fit, or function, Rolls-Royce often changed the drawing requirements for the part to make them less restrictive.  According to one DCMA representative, in such situations, where MRB activity or other reviews revealed that the drawing specifications were too restrictive, the agency "strongly

17

encourage[d]" Rolls-Royce to revise the specifications to provide for increased tolerances.  Devaryju Dep. at 23.  Such a change would be instituted through a Class II AEM.  Cedoz Decl. ¶ 55.

**Relator's Communications With Defendant**

While employed at Rolls-Royce, Mr. Lusby wrote various memoranda to Rolls-Royce senior management regarding his belief that the processes the company was using to manufacture T56 engine parts were unable to manufacture conforming parts with repeatability.  On October 28, 1995, Mr. Lusby sent a memo to Collin Green, former Rolls-Royce Executive Vice President of Operations, expressing his opinion that the P-Point and best-fit manufacturing processes were not reliably producing conforming blades and that Rolls-Royce should instead use a "stalk datum/hard point tooling system" ("stalk datum method") manufacturing process[10] to ensure repeatability.  CL Exh. 17B.  On June 24, 1996, Mr. Lusby completed an engineering evaluation request accompanied by a report recommending implementation of the stalk datum method for the third stage turbine blades.  CL Exh. 58.

Approximately two years later, on November 6, 1997, Mr. Lusby sent a memorandum to Terry Graham, Rolls-Royce's Executive Vice-President of Operations, voicing his support for proposed changes to Rolls-Royce's turbine airfoil manufacturing

---

[10] As opposed to securing the blade by the airfoil as the best fit and P-Point manufacturing processes do, a stalk datum/hard point tooling system clamps the blade at limited points on the stalk, which is a smaller section of the blade.

processes for T56 blades and vanes that would eliminate the matrix pour up procedure then-used by the company and instead institute "hard point" mounting and machining methods.  In that memo, Mr. Lusby stated that he believed such changes would lead to significant cost savings for the company and also noted that there were a number of "strategic" and "sensitive" reasons for instituting the changes about which he did not elaborate.  CL Exh. 17C.  On April 3, 1998, Mr. Lusby sent a similar memorandum to John Ferrie,[11] offering to "write a book" on how "to fix" Rolls-Royce and attaching the November 6, 1997 memo he had sent to Terry Graham.  CL Exh. 17D.

On June 26, 2001, Mr. Lusby sent a memorandum to Ron Bates, Rolls-Royce's Director of Production Operations, recounting his efforts to institute certain changes to the manufacturing process for T56 engine parts, including the use of stalk datums.  In that memo, Mr. Lusby stated that he had advised such changes not only for cost-saving reasons, but also because he had concluded that other processes "may have never actually made a T56 turbine blade that met the engineering print."  CL Exh. 17E.

Mr. Lusby contends that, despite receiving these memoranda, Rolls-Royce did not transition to the stalk datum/hard point tooling system that he recommended until 2001 for T56 Series III first and third stage blades and 2006 for T56 Series III second stage blades.  In an AEM revising the manufacturing method of the T56 Series III third stage blades to the stock datum system, Rolls-Royce listed the benefits of the stock datum

---

[11]  The record is not clear regarding John Ferrie's position with Rolls-Royce at the time.

system as follows: "These changes ... will provide a significant savings in a reduction of standard hours, scrap, rework and MRB.  The new as-cast shroud features will allow for better control of shroud wall thickness, while the stock datum system will provide for the checking of blade features at any point in the blade's service.  With the current airfoil nest system, many blade features cannot be checked after encapsulation melt-out with any reliability/repeatability."  CL Exh. 31.

**The Instant Litigation**

This case has a protracted history before our court.  On May 5, 2003, Mr. Lusby filed his initial complaint.  On July 29, 2005, the Government formally declined to intervene and, on August 2, 2005, the Court lifted the seal and ordered Mr. Lusby to serve his complaint on Rolls-Royce.  After his initial and substitute counsel both withdrew, on December 7, 2006, Mr. Lusby filed a *pro se* amended complaint.  Mr. Lusby subsequently retained new counsel and, on February 9, 2007, was granted leave to file an amended complaint, which contained new allegations and claims.

On December 20, 2007, the Court granted Rolls-Royce's motion for judgment on the pleadings, allowing Mr. Lusby time either to dismiss the action or file a motion for leave to file an amended complaint.  Mr. Lusby elected to move for leave to file a second amended complaint, but the Court denied his motion and dismissed the cause of action with prejudice, ruling that his claims were barred by the doctrine of res judicata and that he had failed to plead his FCA claims with sufficient particularity.  Mr. Lusby appealed that decision and, on June 30, 2009, the Seventh Circuit affirmed in part and reversed and

remanded in part directing that there be a ruling on the merits of Mr. Lusby's claim under 31 U.S.C. § 3729(a) of the FCA.  United States ex. rel Lusby v. Rolls-Royce Corp., 570 F.3d 849 (7th Cir. 2009).

On August 24, 2009, after remand, Mr. Lusby filed a Second Amended Complaint against Rolls-Royce.  Currently before the Court is Rolls-Royce's Motion for Summary Judgment, filed on October 7, 2011.

## Legal Analysis

## I.    Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  Michas v. Health Cost Controls of Illinois, Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. Id. at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). Thus, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. See Shields Enter., Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated. See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

## II.    Discussion

### A.    Statute of Limitations

Rolls-Royce first argues that any claims based on events occurring before May 9, 1997 are barred by the statute of limitations. The applicable limitations period is the

greater of six years from the date of the false claim or, if the Government intervenes in

the *qui tam* action, three years from the date of the Government's knowledge of the claim.

31 U.S.C. § 3731(b)(1), (b)(2).  Because the Government has not intervened in the instant

litigation, the applicable limitations period is six years.  In his response, Mr. Lusby does

not dispute Rolls-Royce's analysis.  Accordingly, because Mr. Lusby filed his complaint

in this action on May 9, 2003, any allegations regarding claims that occurred prior to May

9, 1997 are barred by the statute of limitations.

### B.     False Claims

The False Claims Act makes it unlawful to knowingly present, or cause to be

presented to the United States, a false or fraudulent claim for payment.  31 U.S.C. §

3729(a)(1) (2006).  Private individuals, referred to as "relators," are permitted under the

False Claims Act to file civil *qui tam* actions on behalf of the United States to recover

money that the government paid as a result of conduct prohibited under the Act.  United

States ex rel. Yannacopoulos v. General Dynamics, 652 F.3d 818, 822 (7th Cir. 2011)

(citing Glaser v. Wound Care Consultants, Inc., 570 F.3d 907, 912 (7th Cir. 2009)).  To

establish liability, "a relator generally must prove (1) that the defendant made a statement

in order to receive money from the government; (2) that the statement was false; and (3)

that the defendant knew the claim or statement was false.  Id. (citing United States ex rel.

Gross v. AIDS Research Alliance-Chicago, 415 F.3d 601, 604 (7th Cir. 2005)).

Here, Mr. Lusby alleges that in order to get paid by the Government Rolls-Royce

regularly provided certificates of conformance with its deliveries certifying that all of the

delivered parts conformed to the contractual requirements and specifications and had been subjected to and passed all inspections required by the contract in accordance with Rolls-Royce's ISO 9001-certified QAS.  Mr. Lusby contends that, in truth, the company knew or had reason to know when it submitted these certificates of "regularly recurring nonconforming parts, continuing flawed manufacturing and inspection processes, and noncompliance and overall ineffectiveness of its QAS."  Pl.'s Resp. at 17-18.

The FCA "attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the '*claim for payment*.'  Therefore, a central question in False Claims Act cases is whether the defendant ever presented a 'false or fraudulent claim' to the government."  Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 785 (4th Cir. 1999) (internal citations and quotations omitted) (emphasis added).  Under Seventh Circuit law, for an FCA claim to survive summary judgment, a relator must present evidence of at least one knowingly false claim that was actually submitted to the government; mere possibility, or even probability that a claim was filed is insufficient at the summary judgment stage.  United States ex rel. Crews v. NCS Healthcare of Ill., Inc., 460 F.3d 853, 856 (7th Cir. 2006).  Relator has shown that he is unable to meet this burden of proof.  Although the facts in this case are complex, technical, and disputed at almost every turn, there is no dispute that, even after extensive discovery, Relator is unable "to identify individual parts and transactions involving nonconforming goods sold to the government."  Pl.'s Resp. at 20.  Relator concedes that he has no individualized knowledge that a particular part that failed to meet contract

specifications was ever sold to the government.  RR Exh. 13A at 231:2-10, 236:8-13; RR

Exh. 13B at 110:15-19, 196:1-5.  Thus, he has no proof of there having been a false claim

for payment made by Rolls-Royce to the Government.

Relator asks this Court merely to assume that any nonconforming part he points to

*must have* been delivered pursuant to an actual submitted certificate of conformance, was

subject to the manufacturing and inspection processes that he contends Rolls-Royce knew

were faulty, and was sold within the applicable statute of limitations.  However, Relator

does not dispute that, while many purchase orders mandated certificates of conformance,

not all did.  Compare Docket No. 141-1 with Docket No. 141-2; see also RR SOF ¶ 30

(not disputed by Relator).  Moreover, those that did contain such a requirement did not all

require the same certification.  Compare RR Exh. 8A with RR Exh. 8B.

The evidence also shows that Rolls-Royce produced the T56 blades and vanes with

the part numbers challenged by Relator for decades and that the manufacturing and

inspection processes that Relator asserts caused the purported nonconformances, thereby

rendering the certifications false, were not universally used with every blade and vane

throughout that period of time.  In some cases, the processes used had been modified over

time, or, as is the case with the best fit method, had been largely superseded by the start

of the relevant time period.  RR Exh. 2 at ¶ 11.  Nor is there sufficient evidence to show

that the manufacturing processes and inspection methods that Relator challenges were

incapable of producing conforming parts such that we could or should assume that all

parts produced using those methods were faulty.  In fact, one of Relator's own witnesses

conceded that those processes, when performed properly, *were* capable of producing parts that conformed to the required specifications.  CL Exh. 22 ¶¶ 5-6.

Given all these variables, Relator cannot expect to satisfy his burden at summary judgment by generally pointing to the existence of a grab bag of randomly selected parts that he contends were nonconforming without linking those parts to a particular certificate of conformance that was presented to the Government within the applicable limitations period and from which Rolls-Royce knowingly deviated.  At this late stage in this litigation, mere assumptions and speculation are insufficient to carry the day.  See Crews, 460 F.3d at 856 (citing United States ex rel. Clausen v. Lab. Corp. of Am., Inc., 290 F.3d 1301, 1311 (11th Cir. 2002) (holding plaintiff cannot "merely ... describe a private scheme in detail but then ... allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government"); United States ex rel. Aflatooni v. Kitsap Physicians Serv., 314 F.3d 995, 1002 (9th Cir. 2002) (holding plaintiff must come to court with a "claim in hand" and "generalized, speculative suppositions" will not suffice)).  In the oft used phrase, summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events."  Arnett v. Webster, 658 F.3d 742, 760 (7th Cir. 2011) (quoting Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003)).  Relator has entirely failed to make such a showing here.

In fact, Relator does not deny that he is unable to show the submission of an actual

false claim.  Instead he argues that such a showing is impossible to make because the T56 blades and vanes are not serialized or assigned a tracking number, and thus, he should be excused from such a requirement.  Relator argues that the burden of proof should shift to Rolls-Royce to prove its actions were legal because "[t]he absence of accurate data associated with the wrongdoer's conduct requires that it bear the risk of uncertainty which its own wrong has created."  Pl.'s Resp. at 21.

Relator cites no case law to support such a shift in the burden of proof.  The cases he does cite involve attempts to establish damages after liability has been determined but do not support Relator's contention that the burden of proof should shift to Rolls-Royce in the situation such as is presented here.  The argument that Rolls-Royce should be required to prove that each and every claim it ever filed with the Government was accurate and truthful and thus lawful is one that the Seventh Circuit has recognized "defies common sense and the plain language of the FCA."  <u>Crews</u>, 460 F.3d at 857. Relator has been unable to point us to any provision in the applicable contracts that required the parts to be serialized, nor is there any other evidence that Rolls-Royce failed to assign the parts tracking numbers for some unlawful purpose.  Given these uncontroverted facts, we find no legal authority under the FCA for shifting the burden of proof to Rolls-Royce.

## III.    Conclusion

For the foregoing reasons, we <u>GRANT</u> Defendant's Motion for Summary Judgment.  Final judgment shall be entered accordingly.

Date: ___ 09/24/2012

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Jeff M. Barron
BARNES & THORNBURG LLP
jeff.barron@btlaw.com

Michael R. Brunelle
BARNES & THORNBURG LLP
mbrunelle@btlaw.com

Jill Z. Julian
UNITED STATES ATTORNEY'S OFFICE
jill.julian@usdoj.gov

Edward A. McConwell Sr.
MCCONWELL LAW OFFICES
ed@mcconwell.com

Koryn Michelle McHone
BARNES & THORNBURG LLP
kmchone@btlaw.com

Peter Abernethy Morse Jr
BARNES & THORNBURG LLP
pmorse@btlaw.com

Joseph  Striewe
joestriewe@striewelaw.com

Richard P. Winegardner
BARNES & THORNBURG LLP
rwinegar@btlaw.com